**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| PLAINTIFF, DOMINIQUE TIMMONS individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>RECKITT BENCKISER LLC and RB HEALTH (US) LLC,<br><br>Defendants. | Case No.: 25-cv-12192<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, DOMINIQUE TIMMONS, ("PLAINTIFF" or "Plaintiff"), individually and on behalf of all others similarly situated (the "Class"), brings this Class Action Complaint against Defendant Reckitt Benckhiser LLC and RB Health (US) LLC, ("Reckitt" or "Defendants") and, upon information and belief, alleges as follows:

## NATURE OF THE CASE

1. Defendants manufacture, market, sell, and distribute purported brain health supplements under the brand name Nueriva - Neuriva Original, Neuriva Original Strawberry Gummies, Neuriva Plus, Neuriva Plus Strawberry Gummies, and Neuriva Ultra (the "Neuriva products", "Neuriva" or "the products").[1]

2. All of the products contain two main active ingredients (the "two main ingredients") – soy-derived phosphatidylserine ("S-PS") and coffee cherry extract ("CCE").

[1] Recently, Defendants introduced a new Neuriva product – Neuriva – Brain Performance – De-stress. At this point in time this product will not be included in the class(es) sought to be represented here as it only contains one of the two main ingredients.

3. Defendants represent on all of the products' front labeling as well as on their web site that these two ingredients help one's memory, focus, concentration, learning, and accuracy ("brain health/performance benefits").

4. Defendants' brain health/performance representations are false, misleading or deceptive as experts in the field deem that these two ingredients in combination or alone cannot and do not provide any of the represented brain health/performance benefits.

5. While there have been non-substantive changes to the labelling representations or on those made on their web site (where the first thing that a consumer sees is the front of the product labeling), the message conveyed by Defendants about their Neurvia products has been uniform and similar to the following: (1) that the Neuriva products have been "clinically tested" to increase levels of BDNF when, in fact, Defendants' own study showed no such effects, and (2) that "Neuriva Original supports 5 indicators of brain health: focus, memory, learning, accuracy, and concentration. . . . Both Neurofactor and plant sourced phosphatidylserine are naturally sourced and have been clinically tested to support brain health." https://www.schiffvitamins.com/collections/capsules/products/neuriva-original-brain-health-clinically-tested-brain-supporting-supplement-with-natural-ingredients (Last searched on January 23, 2025).

6. These five brain health representations are made about each of the Neuriva products and for the reasons set forth below, they are false, misleading or deceptive.

**SOY-DERIVED PHOSPHATIDYLSERINE**

7. PS is a molecule known as a phospholipid and is a component of cell membranes.

8. It consists of two fatty acids attached in ester linkage to the first and second carbon of glycerol and serine attached through a phosphodiester linkage to the third carbon of the glycerol:

**Phosphatidylserine**




Components of phosphatidylserines:

Blue, green: variable fatty acid groups

Black: glycerol

Red: phosphate

Purple: serine

9. The average Western Diet is estimated to include 130 mg of PS daily.

10. Supplemental PS was originally derived from cow brains (bovine PS or "B-PS") but because of mad cow disease it is now plant-derived mostly from soybeans.

11. Soy-derived PS (S-PS), is materially different from animal-derived PS in that S-PS does not have the omega-3 fatty acids EPA and DHA contained in B-PS.

12. S-PS contains mostly linoleic acid which has not been shown to have the potential cognitive benefits that are believed to possibly be provided by DHA and EPA.

13. High quality/scientifically reliable clinical evidence of S-PS is limited to one clinical trial on soy-derived PS and the results of that study showed that S-PS was no better than placebo for subjects with age-associated memory impairment – or in other words it was proven ineffective in providing any brain health/performance benefits in healthy adults with memory complaints. "The Influence of Soy-derived Phosphatidylserine On Cognition in Age-Associated Memory Impairment." Jorissen et al., Nutritional Neuroscience Vol. 4, pp. 121-134 ("In

conclusion, a daily supplement of S-PS does not affect memory or other cognitive functions in older individuals with memory complaints."). (Exhibit A).

14. And, as more fully discussed below, Defendant published the results of what was purported to be a randomized controlled clinical trial on Neuriva Original – a product that shares the two main ingredients found in all of the Neuriva products.

15. Defendants have at certain times, albeit falsely, claimed on their labeling and on their web site that this study established the efficacy of Neuriva but, when evaluated by experts in the field, applying well-accepted clinical trial principals and analyses, this study actually proves the contrary- that Neuriva and its two main ingredients are no better than placebo. See, Doma et al. "A Randomized, Double-Blind, Placebo-Controlled, Parallel Study Investigating the Efficacy of a Whole Coffee Cherry Extract and Phosphatidylserine Formulation on Cognitive Performance of Healthy Adults with Self-Perceived Memory Problems" Neurol Ther (2023) 12:777-794 ("Doma et al."). (Exhibit B).

16. Plaintiff has engaged a world renown brain health expert, Dr. Richard Bazinet to evaluate Doma et al. and submit a report of his analysis of the findings of Doma et al. is attached. (Exhibit C).

17. His summary conclusion is: "I find not only that the conduct and reporting of Doma et al., has many material problems and that it cannot and should not be relied upon to support any brain health benefit claims for Neuriva, but, in fact, the reported results actually demonstrate that Neuriva does not provide any brain health benefits."

18. For example, Doma et al. reports that they performed, at a minimum, 102 statistical tests, yet they only report statistically different results between the Neuriva and Placebo group for 5 tests – or in other words – 97 tests showed no statistical significance.

19. Where, as is the case in Doma et al., 97 out of 102 statistical tests show no statistical significance, the possibility of their being 5 positive results is deemed to be due to chance as opposed to efficacy and experts in the field would reach only one possible conclusion based upon there only being 5 positive results out of 102 – this study proves that Neuriva does not work as Defendants represent.

20. And as more fully discussed below and as discussed in the attached report of Dr. Richard Bazinet, a world renown brain health/performance researcher, there are numerous other reasons why Doma et al. does not and cannot demonstrate efficacy and, instead, proves that Neuriva is no better than placebo.

**WELL-SETTLED BODY CHEMISTRY SCIENCE DEMONSTRATES THAT THE PS IN THE NEURIVA PRODUCTS CANNOT PROVIDE ANY OF THE REPRESENTED BRAIN HEALTH/PERFORMANCE BENEFITS**

21. Most important, in addition to the clinical trial evidence that shows that S-PS is ineffective, the lack of efficacy of S-PS for any possible brain health/performance benefits is conclusively shown based upon basic body chemistry science, as S-PS is subject to digestion once it is ingested as a dietary supplement.

22. During digestion the two lipids in S-PS are separated from the serine molecule and thereafter they enter the bloodstream separately.

23. The two lipids are fats and cannot and do not provide any brain health/performance benefits as they are no different than a small bit of butter or oil – approximately 93mg of fat (0.0033 ounces) – far less than a pat of butter.

24. Thus, once ingested the S-PS in Neuriva is completely digested in the small intestine into its constituent components, two lipids, a serine molecule and a glycerol molecule.

25. They are then absorbed by the mucosal cells of the intestine.

26. And, while they can be reacylated into S-PS, the majority of S-PS is converted into other phospholipids.

27. These along with the lesser amounts of S-PS enter the lymphnodes and circulation and are distributed throughout the body.

28. The available evidence indicates that only part of ingested S-PS reaches systemic circulations as part of the phospholipid pool as for all routes of administration, approximately 60% of ingested S-PS is excreted in feces, while 10% is eliminated in urine.

29. Moreover, little of the remainder is used to make PS and instead is used to make other phospholipids.

30. Likewise, 100mg of S-PS generates approximately 7mg of Serine.

31. Serine is an amino acid, is ubiquitous throughout the body as it endogenously made in our bodies and in every cell.

32. In addition to what our bodies make, we derive anywhere from 3.5-8 grams of serine in our diets every day and thus the 7mgs of serine provided by a 100mg dose of S-PS, once digested, enters our bloodstream and is immediately diluted in a sea of serine, making the serine from the S-PS infinitesimal in amount and indistinguishable from all of the other serine.

33. As a result, a 100mg dose of S-PS has little to no effect on our serine levels and our overall health let alone brain health/performance.

34. So, for the most part the S-PS in Defendants' products never gets into circulation and what does enter circulation is scattered to the wind so to speak, as it becomes part of a vast pool of phospholipids in the human body that are taken up by numerous tissue cells for a variety of purposes other than brain health/performance.

35. As such, the amount of the components of the S-PS or reacylated PS from the components in Neuriva that might arrive at the brain are infinitesimal, a matter of random chance, and given that the all the tissues in the body may latch onto these components, the amount that might arrive at the brain is trivial at best and could not provide any of the brain health benefits represented by Defendants.

36. Moreover, even if all 7 mgs of serine in a 100mg dose of S-PS were to arrive at and enter the brain it would amount to 0.0035 of the total 2 grams of serine in our brains at any given time – miniscule and having no potential of affecting brain health/performance.

37. Further, we do not need the S-PS in Defendants' Neuriva products as the tissues in the human body, including the brain, endogenously make their own PS as needed from a variety of ingredients readily available to them from the foods we eat such that the S-PS in Neuriva is superfluous and unneeded.

38. Moreover, as we age our levels of PS in our brains remain constant throughout our adult lives such that there is no PS deficiency that the PS in Neuriva could supplement. The brain maintains its PS levels at 13-14% throughout our lifetimes such that there is no deficiency of PS that the PS in Neurirva could ameliorate even if, after digestion, its component parts could be recombined and arrive at the brain.

39. Yet, Defendants falsely state on their web site that, " Phosphatidylserine is a phospholipid naturally present throughout the body but declines in our brains as we age." https://www.schiffvitamins.com/pages/neuriva-ingredients. (Last searched on 1/15/25).

40. In fact, because the constituent parts of the components of PS are so ubiquitous there is no known PS deficiency in the general non-diseased population.

41. A panel of experts of the European Food Safety Authority concluded that a cause and effect relationship cannot be established between the consumption of phosphatidylserine and "memory and cognitive functioning in the elderly", "mental health/cognitive function" and "stress reduction and enhanced memory function." "Scientific Opinion on the substantiation of health claims related to Phosphatidylserine (ID 552, 711, 734, 1632, 1927) pursuant to Article 13 (1) of Regulation (EC) No 1924/2006" – EFSA Panel on Dietetic Products, Nutrition and Allergies (NDA), European Food Safety Authority (EFSA), Parma, Italy. (Exhibit D).

42. For all of these reasons, including the body chemistry evidence as well as the clinical trial evidence discussed herein, the S-PS in Neuriva does not and cannot provide any of the represented brain health benefits made by Defendants on the Neuriva labeling on its webpage or in its advertisements on TV and elsewhere.

**COFFEE CHERRY EXTRACT**

43. And the same is true with regard to CCE.

44. Coffee cherry extract is the other main ingredient in all of the above mentioned Neuriva products.

45. CCE is the fruit left over after one picks out the coffee bean.

46. CCE has been largely used as animal feed or as a compost for use as a fertilizer.

47. It has some amount of antioxidants but no more than any other fruit.

48. By Defendants own admission the amount of CCE in Neuriva is equivalent to eating three-four coffee cherries. https://www.schiffvitamins.com/blogs/brain-health/breaking-down-the-research-behind-coffee-cherry-phosphatidylserine?srsltid=AfmBOoobQASufpz_o3YdJlKBzlzY16xzg-JbCga2cydBicFiBN-pa3ah. (Last searched on 4/2/24).

49. The coffee cherry's composition is similar to that of other cherries such that if the representations made about CCE were true one could derive the same benefit from other cherries.

50. Moreover, the clinical trials performed on CCE are for the most part shoddy and unreliable from a scientific standpoint, and experts in the field view that the few that are somewhat reliable show that CCE does not provide any brain health benefits.

51. Defendants' use of CCE is based upon an unproven hypothesis that CCE stimulates the production of BDNF (Brain derived neurotrophic factor) – something that is believed to play a role in the differentiation and survival of neurons in the brain.

52. But little is known about this other than too much BDNF may negatively affect learning, and as discussed below, Doma et al. reported "no significant differences between groups were observed for BDNF" when it came to the CCE in Neuriva Original – which is in the same amount for all Neuriva products.

53. Yet, on their web site, Defendants' falsely or deceptively state that CCE has been "clinically tested to increase levels of the neuroprotein BDNF (Brain Derived Neurotropic Factor) known to strengthen connections between brain cells." https://www.schiffvitamins.com/collections/capsules/products/neuriva-original-brain-health-clinically-tested-brain-supporting-supplement-with-natural-ingredients (Last searched 1/15/25).

54. As a result, CCE is not materially different than any other fruit and has no effect on brain health/performance.

**A CLINICAL TRIAL CONDUCTED BY DEFENDANTS ON NEURIVA ORIGINAL SHOWS THAT IT IS NO BETTER THAN PLACEBO**

55. Finally, Defendants recently published the results of a clinical study they had performed on Neuriva Original – a product that contains the two main ingredients in all of the Neuriva products.

56. Authored by Doma et. al., it was published in an open-access, single review, for-profit, rapid publication journal that agrees to publish studies within as little as two weeks and, unlike more reputable journals, it charges submitters upwards of close to $7,000 to publish their papers.

57. These sorts of journals stand in stark contrast to the rigorous double-blinded peer-review process that studies are subject to in such publications as the New England Journal of Medicine, JAMA and other more reputable journals.

58. Moreover, it should be understood that publication in any peer-reviewed journal does not mean that the publication supports the accuracy of the reported results or the conclusions reached by a study's authors but, rather, merely means that the publication believes the study report is worth sharing with the scientific community so that it can be discussed and, if possible, replicated.

59. Moreover, reflective of the shoddiness of this particular journal, because, as discussed above, there are numerous gaps in the study's reporting (such as there being no protocol described as well as material gaps in the statistics reported), this study report does not even enable scientists to replicate the study.

60. Likewise, not surprising, the study report has serious flaws both in design, execution, statistical analyses, its discussion of the results and the conclusions it reaches.

61. For instance, there are material inconsistencies in the published report on such critical things as the number of subjects enrolled, the number who finished the study and the number of subjects that were included in various statistical analyses.

62. Likewise, experts in the field of brain health studies require that only "intention to treat" statistical analyses be employed[2] in order for a study's statistical analyses to be deemed reliable.

63. Per protocol statistical analyses[3] are deemed unreliable by experts in the field of brain health for numerous reasons, among them being that they risk data being manipulated in a manner such that a positive result might be found where none exists under accepted statistical analyses.

64. That this study report was subject to this manipulation is patently evident as the authors state that the results were presented in a per protocol format unless otherwise stated – meaning that it appears that when the data showed a negative result via the required ITT analyses, the authors chose to obscure and not report these results by employing a per protocol analysis instead.

65. Moreover, the report notes that the ITT population was 138 but that the per protocol population was 128 – a significant reduction in the study population that necessarily skewed the results the authors chose to report.

66. Furthermore, basic arithmetic errors can be found in the report for such critical things as how many people completed the study – as at one point Defendants report that 128

[2] This requires that the statistical analyses include any and all data from all subjects who were chosen to participate in the study regardless of whether or not they ultimately finished the study to its completion.
[3] Per protocol statistical analyses include only those subjects who finished the study to completion.

completed the study per protocol and then at another point they report that 133 completed the study.

67. Basic errors like these throw any meaningful statistical analyses completely out of whack.

68. Likewise, much of the "statistically significant" results were merely reporting the intra/within group changes from baseline within the placebo or Neuriva group respectively, as opposed to the differences in the changes in the Neuriva group versus the placebo group being statistically significant.

69. Reporting results from intra/within group changes from baseline rather than comparing between group changes from baseline means that the reported results do not have a control – or – in other words the bulk of the reported statistical analyses are not the results of a randomized *controlled* clinical study.

70. Measures of intra-group changes mean nothing, as it is only when there are statistically significant differences in the inter-group comparisons that efficacy conclusions can be reached.

71. And the fact that the majority of the "statistically significant" results were based upon intra/within group analyses is a red-flag that the inter/between group analyses were not statistically significant – or to put it simply – the bulk of the study's results prove that Neuriva is no better than placebo.

72. Another major problem in Doma et. al is that for particular endpoints defendants engaged in cherry-picking the results.

73. Thus, for example, with regard to memory- where 21 tests were used, only 5 of those tests resulted in a finding of a statistically significant difference between Neuriva and

Placebo – this is a negative result for memory. Yet, it was erroneously reported as a positive result for memory in the study report when, under well-accepted bioistatistical meausres, the 5 "positive" results out of 21 is deemed more likely due to chance as opposed to the claimed efficacy of Neuriva.

74. This is due to the fact where multiple endpoints studied the default statistical significance of 0.05 is no longer applicable as a statistical correction, such as the Bonferroni correction, must be employed such that for example, where two endpoints are studied, 0.05 must be divided by 2 such that statistical significance is only arrived if a 0.025 or less number is derived and so on.

75. Here, where, for example, 21 endpoints were studied just for memory alone, applying the appropriate Bonferroni correction would mean that statistical significance between Neuriva and Plabeco would only be arrived at if the statistical analysis resulted in 0.05 divided by 21 or 0.0024 – a level that is virtually impossible to achieve for anything intervention.

76. It is for this reason that studies, like Doma et al., where upwards of 94 different endponts were studied in total, cannot be used to arrive at efficacy conclusions but, at best, are used for exploratory purposes where, if for example, a statistically significant result is found for a particular endpoint or two, they can then be studied alone with an properly designed and executed clinical trial.

77. And the same cherry-picking results was true for the Compass memory tests as there were no statistical differences between the Neuriva and Placebo groups – yet the report put a misleading spin by contending that there were "greater improvements" in the Neuriva group for 6 of the 21 tests when experts in the field view this as evidence of no statistical difference and thus

a negative result – particularly since even then only 6 out of 21 tests showed “greater improvements”, meaning that 15 did not show any “greater improvements.”

78. And it was the same story for: (1) focus and concentration – with only 4 out of 13 measures resulting in statistically significant differences; (2) accuracy with only 3 out of 13 measures resulting in statistically significant differences; (3) learning – with only 1 out of 14 tests resulting in a statistically significant difference; (4) there were no statistically different differences for the “Go-NoGo” test; and (5) there were no statistically significant differences for the Everyday Memory test.

79. Moreover, Defendants claim on their web site that CCE increases production of BDNF, yet for one of the primary endpoints in this study– changes in BDNF levels, the report notes that, “There was no significant difference in plasma BDNF between Neuriva and placebo groups at day 42.”

80. What should not be lost is that the above results were all negative and showed that Neuriva and its two main ingredients was no better than placebo even when employing a per protocol analysis that improperly skews data in favor of finding efficacy.

81. Finally, in addition to the financial injuries experienced by Plaintiff and the class she seeks to represent, it is well-settled that early detection and treatment of brain health issues such as memory deficits and cognition deficits is paramount to potentially ameliorate future deterioration of these functions.

82. By selling an ineffective dietary supplement based upon false and misleading claims that the Neuriva products provide brain health/performance benefits, many consumers are misled into treating these conditions themselves and ultimately delaying much needed medical interventions.

**THE AVAILABLE CLINICAL TRIAL EVIDENCE SHOWS THAT NEURIVA DOES NOT WORK AS REPRESENTED**

83. Despite the results of this and other trials that show that either in combination or on their own the two main ingredients in the Neuriva products do not work as represented, Defendants note on their web site that these two ingredients – PS and CCE - purportedly "give your brain a helping hand" as they purportedly "fuel five indicators of brain health: focus, accuracy, memory, learning and concentration. It can help you focus in and filter out distractions, react with greater speed and precision, record and recall stored information, retain new information, and keep concentrating on tasks for longer." See, https://www.schiffvitamins.com/collections/capsules/products/neuriva-original-brain-performance-clinically-tested-brain-supporting-supplement-with-natural-ingredients (last viewed on 3/12/24).

84. Yet, as set forth herein, the truth is that the clinical evidence from randomized clinical trials shows that (1) regardless of whether or not coffee cherry extract may or may not increase levels of the neuroprotein BDNF and possibly strengthen connections between brain cells in some small fashion (which it does not), the weight of this same clinical trial evidence demonstrates that coffee cherry extract is no better than placebo such that expets in the field would conclude that these products provide absolutely none of the represented brain health/performance benefits listed on Defendants' Neuriva products' labels and (2) phosphatidylserine does not and cannot provide any of the represented brain health/performance benefits because it is completely digested into generic lipids that on their own as they enter bloodstream post-digestion have no special ability to provide any of the specified represented benefits, even if some of them are not immediately absorbed before they arrive at and enter the brain.

**THE PARTIES**

85. During the relevant time period, Plaintiff DOMINIQUE TIMMONS resided in Chicago, Illinois. On or about July 2023 and during the relevant time period, Plaintiff Timmons was exposed to and saw Defendant's brain health/performance representations when she read the label on a Neuriva Plus package at a Walgreens near where she resides. In reliance on these brain health/performance representations Plaintiff Timmons purchased a package of Neuriva Plus. She took Neuriva Plus as instructed on the packaging but because nothing happened – e.g. she did not experience any brain health/performance benefits - she stopped taking it. She paid in cash at the retail price charged at a Walgreens near where she resided at the time, and which per Defendants' web site was approximately $34.99 (last searched on 4/3/24). The Neuriva product Plaintiff Timmons purchased did not and could not provide the represented brain health/performance benefits. As a result, Plaintiff Timmons suffered injury in fact and lost money. Had Plaintiff known the truth about Defendants' misrepresentations, she would not have purchased Neuriva.

86. Defendants RB and RB Health are Delaware corporations with their principal places of business located in Parsippany, New Jersey. Defendants' corporate parent is a British multinational company traded on the London Stock Exchange that reported net revenue of over £12.8 billion in 2019 alone. Its brand portfolio includes, among others, Mucinex, Clearasil, Lysol, Air Wick, and Woolite.

87. In 2012, Defendant RB paid $1.4 billion to merge with Schiff Nutrition International, Inc. Schiff Nutrition was founded in 1936 as a small supplement company and grew into a multimillion-dollar vitamin and nutritional supplement company. RB's acquisition of Schiff Nutrition allowed it to join the multibillion-dollar vitamins, minerals, and supplements market.

88. Neuriva is a registered trademark of RB Health, and RB Health holds the copyrights for the Neuriva Product labeling and for the website through which Neuriva is marketed. RB Health also distributes the Neuriva Products and is identified as the manufacturer on Amazon.

89. Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.

**COMMON ISSUES EXIST REGARDING DEFENDANTS' CONSUMER FRAUDS**

90. While there are some minor differences in what the labels say about the benefits of each Neuriva product they all come within the ambit of brain health/performance. Thus, for example, for some unknown reason Defendants added "reasoning" as a purported benefit of Neuriva Plus – even though this was never the subject of any clinical trials and based upon the science known by experts in the field, the mere addition of the B vitamins in the Neuriva Plus product – the only different ingredients from original Neuriva - cannot be the basis for Defendants making any additional brain health/performance claims let alone a "reasoning" claim.

91. In fact, there are no known substances – be they prescription or supplement that can or do improve reasoning.

92. And as for the addition of alpina galagna ("AG") to Neuriva Plus and calling it Neuriva Ultra, whether it enhances mental alertness is an open question as at best the science is mixed.

93. But, AG cannot possibly provide any of the other brain health/performance benefits and, again, consumers of the Ultra product have grossly overpaid – close to $2.00 per dose for a product that contains $0.44 worth of AG.

94. The only differences between the Plus and Ultra products and Neuriva Original labeling are minor, in that the Plus product adds "reasoning" as one of the purported benefits and the Ultra product adds "Mental alertness and reasoning" as additional benefits.

95. But they all contain the two main ingredients and it is those ingredients that allow Defendants to market and sell the Neuriva products as something unique.

96. Although, as set forth below, Plaintiff has only purchased Neuriva Plus, since the two main ingredients in all of the products are PS and CCE, plaintiff's claims are common and typical of all purchasers of these products as she has the same interest in proving that the two main ingredients – the ingredients that drive the bulk of the price for the Neuriva products and which are worthless for brain health/performance.

**CLASS DEFINITION AND ALLEGATIONS**

97. Plaintiff bring this action on behalf of herself and all other similarly situated consumers pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and seek certification of the following Class:

Plaintiff seeks certification of the following Class:

**Multi-State Class Action**

> All consumers who, within the applicable statute of limitations period until the date notice is disseminated, purchased Neuriva Original (capsules or gummies), Neuvia Plus (capsules or gummies) and Neuriva Ultra in California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington.
>
> Excluded from this Class are Defendants and their officers, directors, employees and those who purchased the above names Neuvia Products for the purpose of resale.

In the alternative, Plaintiff seeks certification of the following Class:

**Illinois-Only Class Action**

> All Illinois consumers who, within the applicable statute of limitations period until the date notice is disseminated, purchased Neuriva Original (capsules or gummies), Neuvia Plus (capsules or gummies) and Neuriva Ultra.
>
> Excluded from this Class are Defendants and their officers, directors, employees and those who purchased the above names Neuvia Products for the purpose of resale.

98. **Numerosity**. The members of the Classes are so numerous that joinder of all members of the Classes is impracticable. Plaintiff is informed and believe that the proposed Classes contain thousands of purchasers of Neuriva roducts who have been damaged by Defendants' conduct as alleged herein. The precise number of Class members is unknown to Plaintiff.

99. **Existence and Predominance of Common Questions of Law and Fact**. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

a. whether Defendant's brain health/performance benefit representations are false, misleading, or objectively reasonably likely to deceive;

b. whether Defendant's alleged conduct is unlawful;

c. whether the alleged conduct constitutes violations of the laws asserted;

d. whether Defendant engaged in false or misleading advertising; and

e. whether Plaintiff and the Class members are entitled to appropriate remedies, including restitution.

100. **Typicality.** Plaintiff's claims are typical of the claims of the members of the Classes because, *inter alia*, all Class members paid money for Products containing the same primary ingredients in all of the Neuriva products and were injured through the uniform misconduct described above as the Neuriva products do not provide the brain health/performance

benefits represented by Defendants both on the front of the Product labels, in their advertising and on their web site. Plaintiff is also advancing the same claims and legal theories on behalf of herself and all members of the Classes.

101. **Adequacy of Representation.** Plaintiff will fairly and adequately protect the interests of the members of the Classes as they, like all Class members, paid money for Neuriva products that are worthless as they do not provide any brain health/performance benefits. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no adverse or antagonistic interests to those of the Classes.

102. **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

103. Plaintiff, on behalf of the entire Classes, on grounds generally applicable to the entire Classes, seeks equitable relief requiring Defendants to provide full restitution to Plaintiff and the Class members.

104. Unless a Class is certified, Defendants will retain monies received as a result of its conduct that were taken from Plaintiff and the Class members.

105. This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 class members and some members of the Class are citizens of a state different from Defendants. This Court has personal jurisdiction over Defendants because Plaintiff is a citizen of the State of Illinois, the Defendants' relevant product promotion, sales, distribution, and marketing occurred in the State of Illinois, Plaintiff alleges that damages occurred in the State of Illinois, and Plaintiff sues under the laws of the State of Illinois. As a result, Defendants have sufficient minimum contacts with this State and/or sufficiently availed itself of the markets in this State through their promotion, sales, distribution and marketing within this State, including this District, to render the exercise of jurisdiction by this Court permissible.

106. Venue is proper in this Court pursuant to 28 U.S.C. §§1391(a) and (b) because a substantial part of the events giving rise to Plaintiff's claims occurred while he resided in this judicial district. Venue is also proper under 18 U.S.C. §1965(a) because Defendant transacts substantial business in this District.

## CAUSES OF ACTION

### COUNT I
### Violation of Illinois Consumer Fraud and Deceptive Business Practices Act
### 815 Ill. Comp. Stat. 502/1, *et seq.*

107. Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

108. Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

109. In Illinois, the "Consumer Fraud and Deceptive Business Practices Act" 815 Ill. Comp. Stat. 502/1, *et seq.* ("the Act"), like the consumer fraud acts of numerous other states across the nation, prohibits deceptive acts and practices in the sale of such products as Defendant's Neuriva products products.

110. Plaintiff and the Class were injured by Defendants' deceptive misrepresentations, concealments and omissions and these misrepresentations, concealments and omissions were material and deceived Plaintiff and the Class.

111. Defendants do business in Illinois, sell and distribute their Neuriva products products in Illinois, and engaged in deceptive acts and practices in connection with the sale of their Neuriva products in Illinois and elsewhere in the United States.

112. The Neuriva products purchased by Plaintiff and the Class aref a "consumer item" as that term is defined under the Act.

113. Defendants misrepresented and deceptively concealed, suppressed and/or omitted the material information known to Defendants as set forth above concerning their Neuriva products products, which has caused damage and injury to Plaintiff and the Class.

114. Defendants' deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

115. Defendants' deceptive acts proximately caused actual injury and damage to Plaintiff and the Class.

116. Defendants intended Plaintiff and all Class members to rely on its deceptive acts.

117. The conduct of the Defendants constituted a consumer fraud under the Illinois Consumer Fraud Act and similar laws in other states.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, pray for a judgment against Defendants as follows:

a. That the Court enter an order certifying this action as a class action – either as a nationwide class, a multi-state class or, in the alternative, as an Illinois class;

b. That the Court enter an Order against Defendants awarding to Plaintiff and the Class compensatory/actual damages and such other monetary relief as the Court deems appropriate;

c. Attorneys' fees, expert fees and costs; and

d. Such other and further relief as the Court deems just and proper.

Dated: August 7, 2026

**HART MCLAUGHLIN & ELDRIDGE**

By: */s/ Stewart M. Weltman*
Steven A. Hart, Esq.
Stewart M. Weltman, Esq.
One South Dearborn, Suite 1400
Chicago, Illinois 60603
(312) 955-0545 (ofc)
shart@hmelegal.com
sweltman@hmelegal.com

**LEVIN SEDRAN & BERMAN LLP**

By: */s/ Charles E. Schaffer*
Charles E. Schaffer, Esq.
*To be admitted pro hac vice*
510 Walnut St., Ste. 500
Philadelphia, PA 19106
(215) 592-1500 (ofc)
cschaffer@lfsblaw.com

**CUNEO GILBERT & LADUCA, LLP**

By: */s/ Charles LaDuca*
Charles LaDuca, Esq.
*To be admitted pro hac vice*
4725 Wisconsin Ave., NW, Ste. 200
Washington, D.C. 20016
(202) 789-3960 (ofc)
charles@cuneolaw.com

**AUDET & PARTNERS LLP**

By: */s/ Michael McShane*
Michael McShane, Esq.
*To be admitted pro hac vice*
711 Van Ness Ave., Ste. 500
San Francisco, CA 94102
(415) 568-2555 (ofc)
mmcshane@audetlaw.com
***Attorneys for Plaintiffs***